The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Cramer. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioners Opinion and Award and enters the following.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties through the Pre-trial Agreement and at the hearing as
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers Compensation Act.
2. The employer-employee relationship existed between the parties.
3. Spencers, Inc. is insured by Legion Insurance Company and it workers compensation program is administered by Crawford and Company.
4. The parties stipulated into evidence a number of exhibits labeled Stipulated Exhibit #1 through #8, which include forms, discovery responses, medical records, personnel records, ESC records and a job description.
5. Subsequent to the hearing before Deputy Commissioner Cramer, the parties took the deposition testimony of Charles Bokesch, M.D., William Refvem, M.D., Aaron France, M.D., and Gary L. Sigmon, Ph.D. Those transcripts were made a part of the evidentiary record.
***********
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows
 FINDINGS OF FACT
1. Plaintiff, who was fifty-five years old at the time of the hearing before Deputy Cramer, completed the eleventh grade. Plaintiffs work history includes employment as a beautician for approximately fifteen to sixteen years from 1960 to 1976. Thereafter, plaintiff began working for defendant-employer in July 1980 as a box-end labeler.
2. Plaintiff worked in Plant #1 for defendant primarily as a box labeler from the beginning of her employment in 1980 through 1997. Her duties were to label boxes and cardboard sleeves, break apart cardboard sheets that were used as box inserts, take items off a buggy and repackage them, and to catch and stack boxes that were made by a machine. The work was very fast-paced and required repetitive hand movements.
3. In putting on the labels, plaintiff used a measuring cup to pour glue into a machine, put the lid on and turned on the machine. She ran the labels through the machine, which applied the glue. Plaintiff then attached the sticky labels to the boxes. When she first began doing this job, she was putting on about 4,000 labels per day.
4. Around 1995, plaintiff was given additional duties and the number of labels she attached to boxes dropped to about 2,500 per day. Her additional duties included attaching labels to cardboard sleeves, breaking cardboard sheets or "boards into smaller pieces and repackaging them as well as other items. She broke and boxed "boards by the thousands and attached about 500 labels to sleeves per day.
5. Around the end of 1997, the plant closed down the floor where plaintiff worked and plaintiff was transferred to the box shop where boxes were made. In addition to continuing to perform the duties she had performed prior to her transfer, plaintiff was given the duty of "catching boxes as they were made. These boxes were small, most around eight inches by ten inches. Plaintiff caught the boxes using both hands, as they came down a shoot from the machine and she then stacked them on her right and left. Before plaintiff was transferred from her floor in Plant #1 to the box shop, her hands and wrists began to bother her. She experienced pain, tingling and numbness, greater in her right hand than her left. Plaintiff used her hands much more while working in the box shop. Moreover, the pace of her job and her hand movements were faster in part because of the duty of catching boxes where she had to keep pace with the machine which was producing them at a fast pace. Due to this increase in hand movement and the pace of her job, plaintiff began to experience increased hand problems.
6. Although plaintiff first began experiencing pain, numbness and tingling in her hands sometime in 1996, she did not immediately seek medical attention. Plaintiff experienced difficulties with both of her hands, right greater than left. However, after her symptoms increased with her new duties in the box shop, plaintiff reported her symptoms to Cleo Hiatt, the workers compensation manager for defendant-employer around April 1997. Ms. Hiatt completed a report and sent plaintiff for evaluation by Dr. Charles Bokesch at Surry Medical Specialists.
7. Dr. Bokesch is an internal medicine specialist. He screens employees involved in workers compensation injuries with defendant-employer. On April 14, 1997, plaintiffs first visit to Dr. Bokeschs office, she was seen by Wade Marion, P.A. He noted that plaintiff had tingling in both of her hands and arms and suggested she undergo nerve conduction studies, wear a night splint and take Vitamin B-6 and Oruvail. Furthermore, he discussed her case with defendant-employer and, finding that no nonrepetitive work was available, took her out of work for a week.
8. As a result, Brenda Whitaker, R.N., the company nurse arranged an appointment with Dr. Gary Kuzma for plaintiff on April 15, 1997 at which time Dr. Kuzma examined plaintiff who complained of numbness and tingling in her right hand for the past six months. Dr. Kuzma found a positive Phalens and reverse Phalens test, with a negative Tinels test. Dr. Kuzma diagnosed probable carpal tunnel superimposed on peripheral neuropathy. Furthermore, Dr. Kuzma felt that her carpal tunnel was probably related to use of her hand. Therefore, he restricted her to light duty work. Dr. Kuzma felt that plaintiffs employment with defendant-employer was a risk factor in the development of plaintiffs carpal tunnel syndrome but could not state to a reasonable degree of medical certainty that plaintiffs job placed her at an increased risk as compared to the general public. As a result of the light duty recommendation by Dr. Kuzma, plaintiff returned to Ms. Hiatt for light duty work.
9. Plaintiff was informed by defendant-employer that she had to either work in Plant #5 or not work. Plaintiff knew that the work at Plant #5 was too strenuous, even more so than her work as a labeler. The work in Plant #5 consisted of digging in boxes and hanging clothes on hangers, both of which would certainly bother plaintiffs hands. Plaintiffs supervisor, Mr. Ben Tilley, talked to Ms. Hiatt about plaintiff working light duty at the box shop but eventually told plaintiff that she would have to work in Plant #5 on light duty or not work. Plaintiff was concerned about working in Plant #5 and concerned that she would lose her job if she did not work in Plant #5 so she informed Ms. Hiatt by letter dated April 16, 1997 that she would not pursue her workers compensation claim. She then had Dr. Kuzma release her to regular work on April 17, 1997.
10. Thereafter, she continued to work in the box shop as a labeler only. She did not perform any of the other jobs that she had performed in the past. Nevertheless, her hands and wrists caused her pain, especially at night.
11. In October 1997 plaintiff requested a raise so that she would be paid as much as a temporary employee for defendant employer. Plaintiffs supervisor stated that plaintiff could work in Plant #4 or not at all. Plaintiff explored this possibility and was told that she would perform the job of clicking machine operator but she was in fact assigned to another job, Gerber machine operator. This job was fast-paced and required much wrist movement when tying bundles, making boxes, putting garments in boxes, taping up boxes, loading and pushing boxes to the warehouse and getting boxes from a carton. Plaintiff performed this job for less than two and a half days. At that time her hands became so painful that she again complained to Ms. Hiatt who wrote up another claim on October 8, 1997 and referred her to Dr. Bokesch. At this time plaintiffs left hand was beginning to bother her more and more.
12. Plaintiff was seen by Dr. Bokesch on October 8, 1997 at which time he prescribed Naprosyn and a splint. He restricted plaintiff to light duty with no repetitive motion and suggested she return to Dr. Kuzma. Plaintiff returned to Dr. Bokesch on October 15, 1997 complaining of continued hand problems. Thereafter, plaintiff again returned to Dr. Bokeschs office on October 23, 1997 at which time he placed her on permanent light duty with no repetitive motion.
13. Carlos Mayberry, a personnel manager, informed plaintiff on October 23, 1997 that no permanent nonrepetitive work was available with defendant-employer. Thereafter, plaintiffs employment was terminated on October 29, 1997. Plaintiff received short-term disability benefits from October 1997 until January 1998 for three months. Plaintiff paid the premiums for this policy. From January 1998 until July 1998, plaintiff received unemployment benefits.
14. Thereafter, plaintiff was seen by her family doctor, Dr. Rick Bowlin who referred her to Dr. William Refvem, an orthopaedic specialist.
15. Dr. Refvem saw plaintiff on February 2, 1998 and diagnosed her with carpal tunnel syndrome on the basis of her history of complaints of numbness and tingling, a positive Phalens test on the right and the results of a nerve conduction test of the median nerve of the right hand. Plaintiff is an insulin-dependant diabetic and has been so since about 1985. Diabetes places an individual at an increased risk of developing carpal tunnel syndrome, as well as peripheral neuropathy. Although Dr. Refvem acknowledged that an insulin-dependent diabetic is at an increased risk for both carpal tunnel syndrome and peripheral neuropathy and that plaintiffs diabetes could have contributed to her carpal tunnel, he indicated nevertheless that plaintiffs employment with defendant-employer was a significant contributing factor to her carpal tunnel syndrome. Furthermore, he felt that her job placed her at an increased risk of developing carpal tunnel syndrome as compared to the members of the general public. Greater weight is given to the opinions of Dr. Refvem.
16. Plaintiffs treating physician for her diabetes is Dr. Aaron France. Plaintiff has been noncompliant at times in managing her diabetes, and over the year of 1996, she experienced fluctuations in her blood sugar, and high blood sugar levels from time to time. Dr. France acknowledged that higher blood sugar levels increase the risk for peripheral neuropathy. However, these sensory deficits fluctuate and are not necessarily permanent.
17. Dr. Gary Sigmon, a vocational consultant, examined plaintiff on August 15, 1998. He interviewed plaintiff, reviewed her medical records, performed vocational testing and performed a transferability of skills analysis. Dr. Sigmon concluded that plaintiff could not perform any repetitive work, which was characteristic of jobs within her experience.
18. Plaintiff suffers from carpal tunnel syndrome in both hands, which is superimposed on her peripheral neuropathy. The greater weight of the evidence establishes that her employment with defendant-employer caused or significantly contributed to the development of her carpal tunnel syndrome. Furthermore, plaintiffs employment with defendant-employer placed her at an increased risk as compared to the general public not so exposed.
19. Plaintiff worked approximately eight hours a day five days per week at the rate of $7. 32 an hour. Based on the Form 22 wage chart submitted, plaintiffs average weekly wage is $248. 22 yielding a weekly compensation rate of $165. 49.
20.Plaintiff has been incapable of earning the same or greater wages in any employment since October 30, 1997 and continuing.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following
 CONCLUSIONS OF LAW
1. Plaintiff has established by the greater weight of the evidence that her employment with defendant-employer significantly contributed to her development of an occupational disease, carpal tunnel syndrome, which is due to causes and conditions, which are characteristic of and peculiar to her employment with defendant-employer. Furthermore, plaintiffs employment with defendant-employer placed her at an increased risk as compared to the general public not so exposed. N.C. Gen. Stat. 97-53(13).
2. Subject to a reasonable attorneys fee and defendants credit, plaintiff is entitled to temporary total disability benefits at the rate of $165. 49 per week beginning October 30, 1997 and continuing until plaintiff returns to work at the same or greater average weekly wage or further order of the Commission. N.C. Gen. Stat. 97-29.
3. Subject to the limitations of N.C. Gen. Stat. 97-25. 1, plaintiff is entitled to payment by defendants for reasonably necessary medical treatment, which tends to effect a cure, provide relief or lessen the period of disability. N.C. Gen. Stat. 97-25 and97-25. 1.
4. Defendants are not entitled to a credit for plaintiffs short-term disability as she paid the premiums on the plan. N.C. Gen. Stat. 97-42.
5. However, defendants are entitled to a credit for unemployment benefits received by plaintiff. N.C. Gen. Stat. 97-42. 1.
6. As plaintiff has not reached maximum medical improvement, the issue of a permanent partial disability rating cannot be determined. N.C. Gen. Stat. 97-31.
***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Subject to a reasonable attorneys fee and defendants credit, defendants shall pay plaintiff temporary total disability benefits at the rate of $165. 49 per week beginning October 30, 1997 and continuing until plaintiff returns to work at the same or greater average weekly wage or further order of the Commission. N.C. Gen. Stat. 97-29.
2. Subject to the limitations of N.C. Gen. Stat. 97-25. 1, defendant shall pay for plaintiffs reasonably necessary medical treatment, which tends to effect a cure, provide relief or lessen the period of disability. N.C. Gen. Stat. 97-25 and 97-25. 1.
4. A reasonable attorneys fee in the amount of 25% of the accrued and ongoing weekly compensation is hereby approved to be deducted from the lump sum due and paid directly to plaintiffs counsel. Thereafter, it shall be paid by every fourth check directly to plaintiffs attorney.
5. As plaintiff has not reached maximum medical improvement, the issue of a permanent partial disability rating is hereby reserved.
6. Defendants shall pay the costs due the Commission.
This ___ day of August 2000.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DCS:nwg